# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAMES C. E. PRUITT, SR., | ) |
| Plaintiff, | ) |
| | ) Case No. 08 C 1156 |
| v. | ) |
| | ) Magistrate Judge Nan R. Nolan |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

James C. E. Pruitt appeals from an ALJ's decision denying him Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). Because the ALJ's decision is supported by substantial evidence, the denial of benefits is affirmed.

**I.    Background**

Pruitt claims to have become totally disabled on April 11, 2002 because of diabetes, back pain, and chest pain. Pruitt's insured status for DIB purposes expired on September 30, 2004, which means Pruitt had to show that he was disabled on or before that date to be eligible for disability insurance benefits.

Pruitt was born on February 21, 1961. He has a history of uncontrolled diabetes, hypertension, high cholesterol, lower back pain, left-sided chest pain, and left knee pain. Pruitt says that he can lift five to six pounds with his left hand, lift 25 pounds with both hands, walk one block, and concentrate for one to two hours before losing focus or getting tired. Pruitt graduated from high school and has worked as a route monitor and inspector.

The ALJ applied the familiar five-step analysis used to evaluate disability and found that Pruitt had not engaged in substantial gainful activity since April 11, 2002, the alleged

onset date (Step One); his diabetes, degenerative disc disease, diabetic retinopathy, diabetic neuropathy causing chest pains and hypoglycemia are severe impairments (Step Two); but that they do not qualify as a listed impairment (Step Three). The ALJ determined that Pruitt retained the residual functional capacity to perform light exertional work with no work at unprotected heights or around dangerous moving machinery or open flames and bodies of water. Given his RFC, the ALJ concluded that Pruitt was able to perform his past relevant work as a route monitor (Step Four). The ALJ further found that there are a significant numbers of jobs in the national economy which Pruitt can perform: cashier (5,000 light jobs and 800 sedentary jobs); assembler (3,500 light jobs and 2,500 sedentary jobs); and information clerk (1,000 light jobs and 800 sedentary jobs) (Step Five).

**II.    Discussion**

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently gainfully employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is able to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford

v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000).[1]  These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a).  "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error.  Stevenson v. Chater, 105 F.3d 1151, 1153 (7th Cir. 1997).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971).  This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility.  Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ denied Pruitt's claim at Steps 4 and 5, finding that Pruitt retains the residual functional capacity to perform a range of light work.  Pruitt raises two main challenges to the ALJ's decision:  (1) substantial evidence does not support the ALJ's credibility finding and (2) the ALJ erred when he ignored the testimony of the medical expert.  Pruitt's arguments are without merit.

---

[1] Because the standards for disability under both the DIB and SSI program are virtually identical, the Court cites to the DIB regulations except where otherwise necessary.

### A. The ALJ's Credibility Analysis

The ALJ accepted that Mr. Pruitt's impairments could reasonably be expected to produced the alleged symptoms but found that Mr. Pruitt's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible. (R. 23). An ALJ's credibility determination will be reversed only when it is "patently wrong." Herr v. Sullivan, 912 F.2d 178, 182 (7th Cir. 1990). While an ALJ's credibility findings are usually entitled to great deference, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994).

Pruitt first argues that the ALJ's credibility finding is not supported by substantial evidence because the ALJ mischaracterized certain medical evidence in his decision. The ALJ stated twice in his decision that Pruitt was diagnosed with diabetes in March of 2003. (R. 22, 24). The ALJ's statement that Pruitt was diagnosed with diabetes in March of 2003 is incorrect. The overall record indicates that Pruitt was diagnosed with diabetes in March 2001.

The government asserts that this error was harmless because a finding that Pruitt's diabetes began two years earlier would not have changed the outcome of Pruitt's case. The Court agrees that the ALJ's error in identifying March 2003 as the date of Pruitt's diagnosis of diabetes is harmless. Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003) (stating "the doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."). Even if the ALJ had identified March 2001 as the date of Pruitt's diabetes diagnosis, the essential inquiry remains the same–whether or not Pruitt

was disabled prior to his last insured date of September 30, 2004. So long as Pruitt proved that his disability commenced prior to September 30, 2004, he would qualify for disability insurance benefits regardless of whether he was diagnosed in March of 2001 or 2003.[2] Because March 2003 is well before Mr. Pruitt's date last insured, an earlier diagnosis date would not have changed the outcome.

Moreover, as the government points out, a diagnosis of diabetes is not determinative of disability. See Estok, 152 F.3d at 640 (stating "[i]t is not enough to show that she received a diagnosis of fibromyalgia . . ." because "fibromyalgia is not always (indeed, not usually) disabling."); Booker v. Barnhart, 2007 WL 1729985, at *4 (W.D. Va. June 14, 2007) (holding diagnosis of diabetic neuropathy is insufficient by itself to prove disability). Not all diabetics are unable to work, and Mr. Pruitt bore the responsibility of showing how his diabetes affected his functioning and his ability to work. 20 C.F.R. § 404.1512(c).

Pruitt next argues that the ALJ improperly found that his diabetes was well-control prior to May 2005. The ALJ observed in his Step 2 discussion of whether Pruitt had a severe impairment that in April 2003 his diabetes was reported as under control and then two years later on May 26, 2005, Pruitt suffered with poorly controlled diabetes and had become hypoglycemic. (R. 22). Mr. Pruitt is incorrect to interpret the ALJ's decision as finding that prior to May 2005 his diabetes was well managed with medication. It is clear from the ALJ's RFC discussion that he accurately assessed the medical evidence pertaining to Pruitt's diabetes. In his RFC assessment, the ALJ first noted that Pruitt suffers from "significant symptoms associated with diabetes." (R. 24). The ALJ mentioned

---

[2] SSI has no insured status requirement. To obtain SSI benefits, Pruitt must show only that he became disabled prior to the final decision of the Commissioner.

that soon after March of 2003, progress notes indicated that his diabetes was under control. The ALJ then wrote: "[e]vidence however, began to show that the claimant's diabetes was causing other complications. The record noted that the diabetes was not under control and he began to suffer from hypoglycemia (Exhibits 2F & 3F)." (R. 24). The ALJ's citation to Exhibits 2F and 3F, which covers the period from September 25, 2002 through Mary 31, 2006, indicates that he was aware that Pruitt's diabetes was generally uncontrolled prior to May 2005.

Pruitt also contends that when evaluating his credibility, the ALJ inaccurately suggested that he was taking too much insulin resulting in hypoglycemic episodes at lunchtime. Pruitt says the ALJ misunderstood the September 2004 treatment notes. In his decision, the ALJ noted that Pruitt had "not been entirely compliant in taking prescribed medications, which suggests the symptoms may not have been as limiting as the claimant has alleged in connection with his application." (R. 24). The ALJ further stated:

> Specifically, progress notes also noted that the claimant has not always taken his medication as instructed (Exhibit 4F/51). For example, in progress notes dated September 16, 2004 the claimant had complaints of symptoms of hyoglycemi[a] that included feeling jittery and was sweaty and always around noon. The report questioned the claimant's credibility as to why he was only hypoglycemic during the noon time hour or if he was taking additional insulin. Within the September 23, 2004 progress notes, it was noted that it had been difficult to ascertain if the claimant's hypoglycemia was a result of too much medication. The report indicated that the claimant needed close follow-up (Exhibit 3F/79).

Id. Pruitt argues that contrary to the ALJ's interpretation that he was allegedly taking too much insulin, the September 2004 reports are doubting Pruitt's reports of pre-lunch hypoglycemia and do not suggest that Pruiit has been non-compliant with the prescribed regime.

Pruitt's argument is unpersuasive. Although the September 23, 2004 note by the attending physician does not state that Pruitt's alleged noon time hypoglycemia was a result of too much medication, the September 16, 2004 note by the medical resident explicitly questioned whether Pruitt's report of hypoglycemia is true of "if [patient] may be distorting readings for another reason (such as fear of hypoglycemia) or *taking additional insulin*, though he denies." (R. 440)(emphasis added). The ALJ's mistaken description of the September 23, 2004 note does not undermine his conclusion. Substantial evidence supports the ALJ's finding that Pruitt had compliance issues, and therefore his diabetic symptoms could be more controlled if he was compliant with his medications. (R. 244, 368, 370, 373, 397, 412, 416, 419, 439, 445, 448). The medical expert confirmed that the medical records mentioned "non-compliance with the forgetting of getting the insulin refills on time." (R. 531). The ME further stated that he could not explain Pruitt having lunchtime hypoglycemia "unless he's not eating the diet properly when he supposed to eat." (R. 531-32). The ALJ properly considered Pruitt's compliance in assessing his credibility and the severity of his uncontrolled diabetes. Dixon v. Massanari, 270 F.3d 1171, 1179 (7th Cir. 2001) (holding ALJ reasonably determined that claimant's statements about her functional limitations were not credible where ALJ noted, among other things, that "although Dixon had elevated blood sugar levels, she did not always comply with dietary recommendations . . .").

Pruitt asserts that the ALJ erred in failing to seek additional information from his treating physicians on the issue of non-compliance before discrediting Pruitt's description of his functional limitations from his diabetes. The Social Security Regulation, 20 C.F.R. § 404.1512(e), requires the ALJ to recontact a treating physician when the physician's

report contains a conflict or ambiguity that must be resolved, does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory techniques. See also Barnett v. Barnhart, 381 F.3d 664, 669 (7th Cir. 2004) (holding "[a]n ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable."); S.S.R. 96-2p (stating "in some instances, additional development required by a case–for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings–may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's opinion and other substantial evidence in the case record.").

It was not necessary to recontact Pruitt's treating physicians on the non-compliance issue. Although the ME testified that he did not know how much of Pruitt's insulin non-control was because of non-compliance or whether "it really happens" and that he could not explain why Pruitt was having hypoglycemia at lunchtime, the attending endocrinologist was very clear that he did not believe Pruitt was having lunchtime hypoglycemia. (R. 440, 531). The attending endocrinologist concluded that Pruitt "needs close follow-up and perhaps even a hospital admission to discern exactly what is going on." (R. 440). There is no reason to believe that recontacting the endocrinologist would have provided further information regarding Pruitt's reported lunchtime hypoglycemia. There is substantial evidence in the record supporting the ALJ's determination that Pruitt "has not been entirely compliant in taking prescribed medications." See (R. 244, 368, 370, 373, 397, 412, 416, 419, 445, 448). The ALJ acted within his discretion in concluding that the evidence was sufficient to make a disability determination and in deciding to partially discredit Pruitt's

statements about the severity of his uncontrolled diabetes because of noncompliance.

Pruitt complains that the ALJ did not mention certain evidence suggesting that he has significant limitations from uncontrolled blood sugar levels such as polydipsia, polyuria, and change in sensation in his left hand. (Doc. #11 at 12). The ALJ does not have to address every piece of evidence. Rice v. Barnhart, 384 F.3d 363, 370 (7th Cir. 2004). The ALJ adequately discussed Pruitt's diabetes. The ALJ noted in his decision that the medical records indicated that Pruitt's disabetes was "poorly controlled" and "not under control." (R. 22, 24). The ALJ found that Pruitt "suffers from significant symptoms associated with diabetes." (R. 24).

Pruitt contends that the ALJ's finding that his chest pain was controlled with medication is not supported by the record. Pruitt's argument is unfounded. The ALJ's findings show that he fully considered the evidence regarding Pruitt's chest pain. The ALJ noted that Pruitt has "expressed ongoing complaints of chest pain on the left side with radiating pain into his shoulder." (R. 22). The ALJ then summarized the history of Pruitt's chest pain:

> According to a medical report dated August 28, 2003 the claimant stated that the chest pain began in October of 2002. He reported that the chest pain began on the left side of his chest and radiated into his left arm and only occurred when he was at rest. The pain would worsen sometimes when bending over or twisting to the left. The physical examination revealed tenderness in his chest wall and reproducible pain with light touch. The report indicated that the claimant probably suffered from diabetic neuropathy (Exhibit 2F/134). On September 25, 2003 the claimant continued to express complaints of chest pain that radiated into his left arm and hand. He stated that the pain level was 2 out of a possible 10 and at times 10 out of a possible 10 and it was constant in nature. The claimant reported having left hand numbness that was most notable in his fingertips the 2-5 digits. He reported some associated swelling over the left side of his chest wall. The physical examination revealed that his chest pain and symptoms was most likely a musculoskeletal problem (Exhibit 2F/101-103). However, further tests

> [were] ordered to rule out cardiac problems, and in October of 2003 the claimant underwent a cardio stress test with a treadmill and findings were reported as within normal limits (Exhibit 2F/91). In a medical report dated February 23, 2004 the claimant was evaluated for costochondritis due to his complaints of left sided musculoskeletal pain. Progress notes dated May 20, 2005 showed that the claimant's left chest wall pain was diagnosed as neuralgia and it was treated and managed with medication. (Exhibit 2F/6 & 43).

(R. 22). The ALJ noted that the evidence suggested diabetic neuropathy or a musculoskeletal cause for Pruitt's chest pain. (R. 24). The ALJ further found that the medical evidence revealed that Pruitt's chest pain was generally controlled with medication. Id.

The ALJ's finding that Pruitt's chest pain was generally controlled with medication is supported by substantial evidence. On April 8, 2004, Pruitt was seen by a neurologist for his chest pain after a musculoskeletal work-up was negative. (R. 195). The neurologist noted that Pruitt's strength was 5/5 in all 4 limbs and diagnosed intercostal neuralgia. (R. 196). The neurologist started Pruitt on a trial of gabapentin to attempt to alleviate the pain. Id. On May 20, 2004, Pruitt reported that his chest pain was a 2 out of 10 while on gabapentin. Id; see also R. 437 (noting on 09/21/04 that gabapentin helps with Pruitt's chest pain); R. 421 (stating on 11/29/04 that left sided neruopathic like pain is "managed well" with neurontin (gabapentin); R. 379 (noting on 11/10/05 that Pruitt was "comfortable" with gabapentin and capcasian cream). The ALJ's finding that Pruitt's chest pain was generally controlled with medication is consistent with the ME's testimony. The ME stated that Pruitt's chest pain "was well controlled." (R. 529). This is not a case where the ALJ ignored an entire line of evidence contrary to his findings. In his decision, the ALJ acknowledged that Pruitt has "expressed a considerable amount of complaints regarding

pain and discomfort of his chest wall." (R. 24). The ALJ acknowledged Pruitt's chest pain but reasonably determined that it did not significantly interfere with his ability to work.

Pruitt challenges the ALJ's finding that his back pain was "not particularly serious" given Pruitt's management of his back pain with acetaminophen or ibuprofen. (R. 23). Substantial evidence supports the ALJ's finding that Pruitt's back pain was not disabling. The ALJ considered the objective medical evidence concerning Pruitt's back pain. (R.22). The ALJ found that "there [is] no doubt that the claimant had experienced degenerative changes in his cervical and lumbar spine." (R. 23). X-rays of Pruitt's cervical and thoracic spine on August 28, 2003 were normal. (R. 291, 292). An EMG in September 2003 revealed bones spurs at levels C5 and C6 and likely chronic C5-C6 radiculopathy with no acute signs of ongoing denervation. (R. 207, 231, 233). An MRI of the cervical spine in December 2003 revealed very early degenerative disc disease with no significant central stenosis or cord compression. (R. 207). On April 5, 2004, Pruitt's chief complaint was lower back pain. (R. 185). The report indicates a negative Babinski test, good lower extremity strength, and normal sensation of the lower extremity. (R. 187). Although Pruitt reported that the ibuprofen and flexerial he took for his chest/shoulder pain was not effective on his back pain, the nurse practioner recommended Pruitt take extra-strength Tylenol and ibuprofen for pain. (R. 185, 187).

The medical record demonstrates that Pruitt's back pain is not constant and varies in its level of intensity. During the period between July 1, 2004 and May 31, 2006, Pruitt managed his back pain with either acetaminophen or ibuprofen. (R. 363-450). On July 1, 2004, Pruitt complained of back pain greater than 4 out of 10, but he also indicated that his current pain medication relieved the pain. (R. 450). On August 26, 2004, Pruitt

-11-

complained of lower back pain at a level of 8 out of 10 and stated that his current pain medications did not relieve the pain. (R. 444, 447). A week later on September 2, 2004, Pruitt again rated his back pain at 8 out of 10. (R. 441). On September 30, 2004, Pruitt complained of pain in his lower back and left side but reported that his pain medication relieved the pain. (R. 436). On November 29, 2004, Pruitt reported a pain level of 0 out of 10 and stated that he walks half a mile to a mile a day. (R. 426, 427).

On January 24, 2005, Pruitt complained of chronic and achy lower back pain which was unrelieved with extra-strength Tylenol. (R. 412). Pruitt denied bowel or bladder problems, sciatic, numbness or tingling lower extremities. Id. The physical examination did not reveal any evidence of tenderness of the lumbar spine, the straight leg rising test was negative, and his sensation was normal within the lower extremities. (R. 415). The nurse practioner gave Pruitt Ibuprofen, 400 mg three times daily for his lower back pain. (R. 416). On March 24, 2005, Pruitt's pain was at a level 0 out of 10. (R. 408). On May 26, 2005, Pruitt complained of chest, back, and leg pain and stated that his current pain medication did not control the pain. (R. 398). The nurse practioner noted that Pruitt was not in distress and recommend that he take his pain medication per his doctor's order. Id.

On July 7, 2005, Pruitt complained of left-sided chest pain and left knee pain, but not back pain. (R. 393). On August 4, 2005, Pruitt denied having any pain or discomfort. (R. 391). On October 13, 2005, Pruitt rated his pain level at a 0 out of 10. (R. 384). Almost a month later on November 10, 2005, Pruitt stated that he was unable to do any aerobics because of lower back pain. (R. 376). On May 4, 2006, Pruitt was seen for a diabetes follow-up and evaluation. (R. 368-69). He denied any other complaints and rated his pain level at a 1 out of 10. Id. At the June 28, 2006 hearing, Pruitt testified that he was taking

prescription strength ibuprofen for his knee. (R. 516).³ The ALJ's conclusion that Pruitt's back pain is not disabling is also supported by the opinions of the state agency physicians and the ME. (157-64; 530-32). The ALJ reasonably found that Pruitt suffers from some back pain but that the pain was not debilitating.

Pruitt contends that the ALJ erred in failing to consider the side effects of his medications. Pruitt testified that he was unable to work because gabapentin makes him too drowsy. (R. 510, 523). It is true that the ALJ did not mention this side effect in his decision, but that omission is not an error. "The ALJ is not required to make specific findings concerning the side effects of prescription drugs on the claimant's ability to work." Herron, 19 F.3d at 335. Such an argument is interpreted as asserting that the ALJ's decision is not supported by substantial evidence. Id. Here, the ALJ found Pruitt's statements concerning the intensity, persistence and limiting effects of his symptoms not entirely credible. (R. 23). The ALJ did not overlook the possible side effects of Pruitt's gabapentin. At the hearing, the ALJ asked the vocational expert whether additional limitations due to side effects from gabapentin would diminish jobs available to an individual with Pruitt's residual functional capacity. (R. 538-39). The ALJ justifiably rejected Pruitt's testimony of significant side effects from his gabapentin. With two possible exceptions, there is no medical documentation of any gabapentin side effects or complaints of side effects. See R. 400 (complaining of "fatigue" on 4/27/05); R. 441 (stating he has "no energy" on 09/02/04). In addition, the medical expert who was familiar with the medications Pruitt was taking opined that Pruitt was capable of performing a range of light work. (R.

---

³ Prescription ibuprofen is used to relieve mild to moderate pain. See www.nlm.nih.gov/medlineplus/druginfo (visited 03/16/09).

532).

B.     Medical Expert Testimony

Pruitt contends that the ALJ erred in disregarding Dr. Jilhewar's testimony. The ALJ did not error in this regard. First, the ALJ specifically noted that Dr. Jilhewar testified as a medical expert at the hearing. (R. 19). Second, the ALJ noted his "careful consideration of all the evidence." (R. 19). Finally, although the ALJ did not elaborate on the medical expert's opinion in his written decision, the ALJ's residual functional capacity finding is supported by and consistent with the medical expert's opinion. The medical expert concurred with the residual functional capacity assessment of the state agency reviewing physicians who concluded that Pruitt had the residual functional capacity for light exertional work. (R. 157-64; 532). The medical expert's residual functional capacity finding also included a restriction from unprotected heights. (R. 532). The ALJ found that Pruitt retains the residual functional capacity to perform light work with no work at unprotected heights or around dangerous moving machinery or open flames and bodies of water. (R. 23). The ALJ noted that his RFC findings were consistent with residual functional capacity assessment completed by the state agency physicians. (R. 24). An ALJ may properly rely upon the opinion of state agency physicians to determine residual functional capacity. Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2000) (stating "it is appropriate for an ALJ to rely on the opinions of [state agency] physicians and psychologists who are also experts in social security disability evaluation."); see also White v.Barnhart, 415 F.3d 654, 659 (7th Cir. 2005) (stating "[t]he ALJ's ultimate residual functional capacity finding tracked Dr. Steiner's opinion almost exactly, and Dr. Steiner's opinion, buttressed by the State Consultants' opinions, was an adequate evidentiary foundation for the finding.").

Pruitt cites Murphy v. Astrue, 496 F.3d 630, 634 (7th Cir. 2007), for the proposition that "an ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion." Again, the ALJ's residual functional capacity finding is supported by, not at odds with, the medical expert's opinion. Moreover, no physician concluded that Pruitt was more limited than the ALJ found, and the ALJ was not required to articulate his reasons for accepting an uncontradicted opinion. Steward v. Bowen, 858 F.2d 1295, 1299 (7th Cir. 1988).

## III. Conclusion

For these reasons, the ALJ's decision is affirmed. Plaintiff's Motion for Summary Judgment in Support of His Complaint [#10] is denied, and Defendant's Motion for Summary Judgment [#20] is granted. The Clerk is directed to enter judgment in favor of Defendant Commissioner of Social Security and against Plaintiff James C. E. Pruitt.

**E N T E R :**

*Nan R. Nolan*

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated: March 30, 2009**